IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE HARRINGTON,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF NAPA, et al.,<br><br>Defendants. | No. C 04-00958 JSW<br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Now before the Court is the motion for partial summary judgment by Defendants City of Napa (the "City"), Officer Debbie Peecook ("Peecook") and Officer Brent Potter ("Potter") (collectively, "Defendants"). Having carefully considered the parties' arguments, the relevant legal authority, and having had the benefit of oral argument, the Court hereby GRANTS IN PART and DENIES IN PART Defendants' motion for partial summary judgment.

**FACTUAL BACKGROUND**

This action arises out of Plaintiff's arrest after an alleged incident of domestic violence between her and her then husband, John Harringon ("Harrington"). In May 2003, Peecook and Potter responded to a 911 call by Harrington, reporting that Plaintiff hit him with a telephone. (Defendants' Ex. B (Harrington Deposition at 12:10-13:1.) Harrington asked to have Plaintiff arrested. *Id*. Harrington also told Peecook that Plaintiff threw a telephone receiver at him and hit him in the upper right arm with it. Harrington further told Peecook, both orally and in

1  writing, that Plaintiff struck him with her fists. (*Id*. (Harrington Depo. at 17:20-20:11.)[1]
2  Harrington showed Peecook the red marks on him that he claimed Plaintiff caused. (*Id*.;
3  Plaintiff's Opp. at 2 ("When the police arrived [Harrington] claimed [Plaintiff] had thrown a
4  telephone, it had hit him, and that this allegedly caused some pink or redness on his skin, and
5  may have caused a single faint scratch.")[2]

6  According to Plaintiff's own statement given to the police department: "[Peecook] went
7  into the house and called for [Harrington] to come out of the bedroom. [Harrington] did not
8  want to come out of the bedroom. When he came down the hall, he was holding his arm. He
9  told her that I had done something to hurt him." (Defendants' Ex. F.)

10  After Plaintiff learned that the officers were going to arrest her, she walked out of the
11  front door to her house using her crutches, and quickly walked to the back of her house and
12  through her back yard over to her grandmothers' house. Plaintiff then walked back quickly into
13  her house, still using her crutches. (Defendants' Ex. A (Plaintiff's Deposition at 57:10-62:8);
14  Declaration of Brent Potter ("Potter Decl."), ¶ 5; Declaration of Debbie Peecook ("Peecook
15  Decl."), ¶ 11). Peecook then handcuffed and arrested Plaintiff. (Peecook Decl., ¶ 13.)

16  Plaintiff called and spoke to Sergeant Steve LaVoy to lodge a complaint concerning the
17  way she was treated when she was arrested. Sergeant LaVoy documented Plaintiff's comments
18  to him and asked her to submit a written statement. (Defendants' Ex. F (Investigation Report).)
19  Plaintiff submitted a written statement which provided:

> I hung up on my mom, and told [Peecook] to give me a minute because I am disabled. I open the door and sat on the bed. I told both of the officers that I was trying to find my shirt. [Peecook] then looked at the other officer and said she didn't have handcuffs and asked if she could use his. He handed her the handcuffs. [Peecook] then grabbed my hand and squeezed it very hard taking the handcuffs and hitting them on my

---

[1] Harrington testified in his deposition that Plaintiff scratched him, but then he later testified that he was not sure if it was Plaintiff who caused the scratch on his chest. *Compare* Defendant's Ex. B (Harringon Depo. at 19:16-20:11) *with* Plaintiff's Ex. A (Harrington Depo. at 154:2-20). Because Plaintiff presented evidence disputing whether Harrington told Peecook that Plaintiff caused the scratch on his chest, the Court will not consider this fact in analyzing Defendants' motion for summary judgment.

[2] Plaintiff presents evidence of and argues over what Potter observed in photographs of Harrington taken at the scene, but what Potter may or may not have seen in photographs does not contradict the evidence of what Harrington told Peecook and what marks Peecook personally observed on Harrington. (Plaintiff's Opp. at 14.)

2

> wrist making them swing around and lock. I screamed loud, and went to grab my hand because it hurt. [Peecook] told the other officer "she strong." I gave her my other hand very fast because it hurt so badly. [Peecook] then told the other officer to grab my arm that they were going to walk me out.
>    When they pulled me up I felt my back crack between my shoulders [sic] blades and screamed because it hurt. About half way down the hall, my hip popped out of place causing my lower back to twist real fast. ... When I got to the front step, I could not take the pain anymore. I just went limp, telling the officers that I had to sit and that I hurt really badly. The male officer told her to let me sit for a minute. I felt like my whole back was out. Then they pick [sic] me back up and put me in her car.
>    ...
>    I was never asked about my medical condition, whether or not it would injure me being taken out with my hands behind my back. I had my wheelchair in the kitchen in clear sight if they needed to move me. I do not feel that [Peecook] needed to hit my wrist with the handcuffs in order to put them on me."

(Defendants' Ex. F.)

After Plaintiff lodged her complaint, Sergeant Gil Gallegos conducted an internal affairs investigation. He reviewed Plaintiff's statement, Sergeant LaVoy's description of Plaintiff's oral complaint, a letter from Plaintiff's doctor (Donald Hitchcock), and the arrest report, and interviewed Sergeant LaVoy, Plaintiff, Dr. Hitchcock, Peecook, Potter, Harrington, Plaintiff's grandmother (Billie Grandgrath), and Plaintiff's daughter (Elizabeth Danner). In a supplemental investigation, Sergeant Gallegos interviewed Officer Rene Solis, Officer Ken Adkins, Tina Kramer, and Darlene Abasta, R.N. (*Id.*)

According to Sergeant LaVoy's written description of Plaintiff's oral complaint, Plaintiff complained that Peecook grabbed her wrists and twisted them behind her back. She said that Peecook hit the handcuffs on her wrist, which later caused large bruising. Plaintiff said that she was screaming because she was being hurt and Peecook said she was resisting arrest. When Peecook walked Plaintiff to her car, Plaintiff asserted that she continually said "ow ... ow ... ow." Plaintiff thought Potter did not seem to agree with the way Peecook was treating her. Potter told Peecook to let Plaintiff sit for a moment, which Peecook refused to do. Plaintiff said that her grandmother and her fourteen-year-old daughter were witnesses. (*Id.*) In Sergeant LaVoy's interview, he added that Plaintiff told him she had to seek medical attention from Dr. Hitchcock for the injuries she sustained from Peecook. (*Id.* (Investigation Report, p. 10).)

In Plaintiff's interview with Sergeant Gallegos, she said that she locked herself in her bedroom. Peecook knocked on the door several times, asking Plaintiff to open the door, but

3

Plaintiff refused until she was able to change her clothes. When Plaintiff finally opened the door to let Peecook in, Plaintiff sat on the bed. Peecook attempted to convince Plaintiff to get up off of the bed and follow her to the police car. Plaintiff said that she did not want to be arrested, but that she did not physically resist arrest. Peecook then reached out and "grabbed" Plaintiff's left wrist and "hit" the handcuffs onto her wrist. Plaintiff reached over and grabbed her left wrist with her right hand because it hurt, and did not do so in an effort to resist arrest. Peecook then grabbed Plaintiff's right wrist. She instructed Plaintiff not to resist as she pulled Plaintiff's right hand away from the handcuffed left wrist. Plaintiff assumed Peecook thought she was resisting arrest because Peecook made a comment to Potter about how strong she was. Plaintiff realized should could not delay being arrested any longer, so she relaxed her body and put her hands behind her back. Peecook then moved Plaintiff's crutches away and handcuffed her two wrists together. Peecook and Potter helped her to stand up by each grabbing one of her arms. (*Id*. (Investigation Report, pp. 12-14).)

Plaintiff further explained that as the officers walked her passed the kitchen on their way out to the car, she saw Harrington, sitting there, "gloating" about her arrest. Plaintiff got extremely upset, and began to yell at him. She wanted to break away from the officers to get at him, but the officers would not let her go. She tried to get at him anyway, and in the process, felt her hip "go out of socket." (*Id*. (Investigation Report, pp. 13-14).)

At the end of the interview, Sergeant Gallegos described that he revisited Plaintiff's points of concern with her and explained about citizen arrests and about why the officers may have removed her crutches from her. He also discussed the method of handcuffing she had described and told her that it sounded appropriate and consistent with department training. (*Id*. (Investigation Report, pp. 16-18).) After Sergeant Gallegos discussed these matters with Plaintiff, she acknowledged that she did not believe Peecook or Potter did anything wrong or intended to hurt her. (*Id*. (Investigation Report, p. 18).)

Sergeant Gallegos interviewed Plaintiff's grandmother, Billie Grandgrath, about the incident, but she did not personally observe the alleged conduct in question. She was merely told about it by Plaintiff a few days later. (*Id*. (Investigation Report, p. 20.)

4

Plaintiff's daughter, Elizabeth Danner, also told Sergeant Gallegos that she did not personally see any interactions between her mother and the officers, but she was able to describe what she heard. She heard her mother lock herself in her room. She heard Peecook kept asking her mother to open her door, and that her mother would not open it. She added that it was her parents who were yelling at each other and that the officers were just trying to help. (*Id.* (Investigation Report, p. 24).)

Harrington, in his interview, reported that Peecook had been very patient with Plaintiff. After Plaintiff locked herself in her room, Peecook tried several times to get Plaintiff to open the door. After several minutes, Peecook finally announced she was giving Plaintiff another 30 seconds to open the door. Another minute passed, and then Plaintiff opened the door. Harrington observed Plaintiff "thrashing around" as the officers tried to walk her out to the police car. He did not believe the officers were abusive in any way. Harrington added that it was Plaintiff who was "thrashing around," especially when they went by the kitchen area where he was sitting. (*Id.* (Investigation Report, pp. 22-23).)

Sergeant Gallegos' interview with Potter further corroborated what the other interviews revealed. Potter said that Plaintiff locked herself in a bedroom to prevent being arrested. Peecook kept knocking on the door and asking Plaintiff to open it until Plaintiff finally did. When he and Peecook entered the bedroom, Plaintiff was sitting on a bed holding onto her crutches. Peecook told Plaintiff that she was being placed under arrest, but she would not comply. After Plaintiff would not stand up, Peecock gave Plaintiff a choice of walking out or being carried out. When Plaintiff did not respond, Peecock took out handcuffs and reached out for one of Plaintiff's wrists. Plaintiff said "I'm not going!" Potter said that Peecook then placed a handcuff around one of Plaintiff's wrists, and then the other. Peecook did not forcibly place the handcuffs on Plaintiff's wrists, but widened the cuffs as far as they would go and then put them on Plaintiff. Potter and Peecook then each took one of Plaintiff's upper arms and guided her onto her feet. Plaintiff did not appear to have a problem walking until they reached the kitchen where Harrington was sitting. Plaintiff then began to twist and thrash about as she yelled obscenities at her husband. After Potter and Peecook were able to get Plaintiff out of the

5

1  house, they let her sit for a few seconds on the front porch.  (*Id*. (Investigation Report, pp. 28-
2  29).)  Potter told Sergeant Gallegos that he though Peecook did not use excessive force, and
3  that the force used was reasonable considering the circumstances.  He believed Peecook went
4  out of her way to be considerate of Plaintiff's physical disability, that she was given the
5  opportunity to walk out on her own, unhandcuffed, but Plaintiff refused and said she would not
6  be arrested.  (*Id*. (Investigation Report, p. 30).)  Peecook, in her interview with Sergeant
7  Gallegos, gave a similar account.  (*Id*. (Investigation Report, pp. 33-35).)

8        The letter from Plaintiff's doctor, Dr. Hitchcock, indicated that he saw Plaintiff on June
9  9, 2003 "for injuries sustained when she was arrested and restrained with handcuffs." (*Id*.)  Dr.
10 Hitchcock wrote that he took X-rays a week prior, which were "negative," and that the areas she
11 complained of feeling pain did not show any deformity.  Dr. Hitchcock diagnosed Plaintiff with
12 "strain and contusions to left wrist and back."  (*Id*.)  When interviewed, Dr. Hitchcock said that
13 he did not see any signs of injury when he examined Plaintiff.  Although she complained of pain
14 to her wrists and back area, such complaints were consistent with Plaintiff's ongoing medical
15 history.  Plaintiff also told Dr. Hitchcock that she had bruising around her wrists from the
16 handcuffing, but he did not see any bruising and the X-rays of her wrists did not show any signs
17 of injury.  He explained that his diagnosis of "strain and contusions of the left wrist and back"
18 was based solely on Plaintiff's account, not on any visible or medical evidence.  (*Id*.
19 (Investigation Report, p. 25).)

20      Based on these interviews, Sergeant Gallegos concluded that Peecook used reasonable
21 force to effect a legal and proper arrest.  Peecook prolonged taking physical custody of Plaintiff
22 and attempted to obtain Plaintiff's voluntary compliance.  After repeated verbal and physical
23 refusals by Plaintiff, Peecook positioned the handcuffs on the last notch and pressed them onto
24 Plaintiff's wrists, being aware and considerate of Plaintiff's physical disability.  (*Id*.
25 (Investigation Report, p. 43).)  Sergeant Gallegos therefore exonerated Peecook.  (*Id*.
26 (Investigation Report, p. 5).)

27      Sergeant Gallegos then conducted a supplemental investigation regarding Plaintiff's
28 booking.  Officer Rene Solis reported to Sergeant Gallegos that she recalled seeing Peecook

6

bring Plaintiff into the booking area unhandcuffed, allowing Plaintiff to walk in by using her crutches. Solis did not recall Plaintiff complaining about her wrists hurting from Peecook's application of the handcuffs, and when Solis looked at Plaintiff's wrists as part of the booking process, she did not notice any injuries that would have been consistent with handcuffs being applied too forcefully or too tight. (*Id.* (Supplemental Investigation, p. 2).) Solis further recounted that Plaintiff "had a bad attitude" and was "belligerent." (*Id.*)

In his interview, Officer Ken Adkins reported that he also did not recall Plaintiff making any complaints that her wrists had been injured by Peecook. Adkins said he would have looked at Plaintiff's wrists as a normal part of the booking practice and did not recall seeing any injuries. (*Id.* (Supplemental Investigation, p. 4).) Adkins also described Plaintiff as "belligerent and argumentative." (*Id.* (Supplemental Investigation, p. 5).)

Tina Kramer was also present during Plaintiff's booking, and confirmed officers Solis' and Adkins' accounts. She did not hear Plaintiff did not complain about her wrists and did not observe any injuries there. (*Id.* (Supplemental Investigation, p. 6).) The same was true for Darlene Abasta, R.N., the intake nurse at the Napa County Department of Corrections. Ms. Abasta did not recall any complaints about Plaintiff's wrists hurting or recall seeing any injuries to Plaintiff's wrists. (*Id.* (Supplemental Investigation, p. 7).)

Sergeant Gallegos thus concluded that: "neither the correctional staff nor the intake nurse at the Napa County Department of Corrections were appalled by the alleged injuries to [Plaintiff's] wrist reportedly caused by [Peecook] forcibly applying handcuffs too tight onto [Plaintiff's] wrists. There is no recollection of visible injuries to [Plaintiff's] wrist, consistent with [Peecook] forcibly applying the handcuffs too tight. There is no statement to support that [Plaintiff] complained of pain or injury to her wrists. There is no evidence to suggest that [Peecook] had to be admonished, by anyone, about her behavior and/or comments towards [Plaintiff.]" (*Id.* (Supplemental Investigation, p. 9).)[3]

---

[3] Defendants objected to the admission of one page from the deposition transcript of Van Blaircom, Plaintiff's expert,. Because such testimony was not necessary to the resolution of this motion, the Court need not rule on the admissibility of such evidence at this time.

7

**ANALYSIS**

**A.      Legal Standard.**

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A principal purpose of the summary judgment procedure is to identify and dispose of factually unsupported claims.  *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986).

The party moving for summary judgment bears the initial burden of identifying those portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine issue of material fact.  *Id.* at 323.  Once the moving party meets this initial burden, the non-moving party must go beyond the pleadings and by its own evidence "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  The non-moving party must "identify with reasonable particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995)) (stating that it is not a district court's task to "scour the record in search of a genuine issue of triable fact").  If the non-moving party fails to make this showing, the moving party is entitled to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

**B.      Defendants' Motion for Summary Judgment.**

**1.      Defendants' are Entitled to Summary Judgment on Plaintiff's 42 U.S.C. § 1983 Claim for False Arrest.**

A law enforcement officer is entitled to qualified immunity in a civil rights action if the district court determines that, in light of clearly established principles governing the conduct in question at the time of the challenged conduct, the officer could reasonably have believed that the conduct was lawful.  *Mendoza v. Block*, 27 F.3d 1357, 1360 (9th Cir. 1994).  This determination requires a two-step analysis.  First, the Court must determine whether the law governing the official's conduct was clearly established at the time the challenged conduct

8

occurred. *Id.* Second, the Court must address whether, under that clearly established law, a reasonable official would have believed the conduct to be unlawful. *Id.* However, even before engaging in this inquiry, the Court must first consider the threshold question of whether the facts viewed in the light most favorable to the party asserting the injury show the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Id.*

Pursuant to 42 U.S.C. § 1983 ("Section 1983"), Plaintiff asserts a claim that she was wrongfully arrested without probable cause in violation of the Fourth Amendment. To prevail on her Section 1983 claim based on false arrest, Plaintiff must demonstrate that there was no probable cause to arrest her. *See Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998). "In evaluating a custodial arrest executed by state officials, federal courts must determine the reasonableness of the arrest in reference to state law governing the arrest." *United States v. Mota,* 982 F.2d 1384, 1388 (9th Cir. 1993). Under California law, probable cause to arrests exists when facts known to the arresting officer "would lead a man of ordinary care and prudence to believe and conscientiously entertain an honest and strong suspicion that the person is guilty of a crime." *People v. Adams*, 175 Cal. App. 3d 855, 861 (1985). The test under California law "is very similar to the Fourth Amendment test applied by [the Ninth Circuit], which provides that '[p]robable cause exists when, under the totality of the circumstances known to the arresting officers, a prudent person would have concluded that there was a fair probability that [the suspect] had committed a crime.'" *Peng v. Mei Chin Penghu*, 335 F.3d 970, 976 (9th Cir. 2003) (quoting *United States v. Buckner,* 179 F.3d 834, 837 (9th Cir. 1999)).

Plaintiff was arrested for violating California Penal Code § 273.5, which provides that: "Any person who willfully inflicts upon a person who is his or her spouse ... corporal injury resulting in a traumatic condition, is guilty of a felony." Cal. Pen. Code § 273.5(a). A "traumatic condition" is defined by the statute to mean "a condition of the body, such as a wound or external or internal injury, whether of a minor or serious nature, caused by a physical force." Cal. Pen. Code § 273.5(c). Thus, this statute "is violated when the defendant inflicts

9

1  even 'minor' injury." *People v. Wilkins*, 14 Cal. App. 4th 761, 771 (1993) (finding officer had
2  reasonable grounds to believe victim had suffered an injury resulting in a "traumatic condition"
3  where officer observed redness around victim's face and nose and she complained of soreness).

4      In essence, Plaintiff argues there was insufficient evidence of an injury under this penal
5  code to support probable cause for arrest. Putting aside the question of whether Plaintiff
6  scratched Harrington's chest, it is undisputed Peecook observed red marks on Harrington in the
7  area where he told Peecook Plaintiff had hit him. Hearing that Plaintiff hit Harrington with a
8  telephone and her fists, and observing red marks on him, gave Peecook reasonable grounds to
9  believe Harrington suffered an injury, albeit a minor one, under § 273.5. *Wilkins*, 14 Cal. App.
10 4th at 771.

11     Even if the red marks do not qualify as an injury, Defendants have demonstrated the
12 existence of probable cause under another statute. The Court's inquiry of whether there was
13 probable cause to make arrest is not limited to the offense actually invoked by the arresting
14 officer. *Devenpeck v. Alford*, -- U.S. --, 125 S. Ct. 588, 593-95 (2004). All that is required for a
15 warrantless arrest to be reasonable under the Fourth Amendment is that there be probable cause
16 to believe that a criminal offense has been or is being committed based on the facts known by
17 the arresting officer at the time of the arrest. *Id.* at 593. The officer's "subjective reason for
18 making the arrest need not be the criminal offense as to which the known facts provide probable
19 cause." *Id.* at 594.

20     Defendants argue that Peecook had probable cause to arrest Plaintiff because an officer
21 may arrest a suspect without a warrant "if a suspect commits an assault or battery upon a current
22 or former spouse." Cal. Pen. Code § 836(d). At the hearing on this motion, Plaintiff made clear
23 that she does not dispute this proposition, but rather argues that Section 836(d) is
24 unconstitutional because it permits a warrantless arrest for a misdemeanor that did not occur in
25 the officer's presence. Unfortunately for Plaintiff, the Ninth Circuit has spoken on this issue
26 and rejected Plaintiff's position. In *Barry v. Fowler*, 902 F.2d 770, 772 (9th Cir. 1990), the
27 court held that the "[t]he requirement that a misdemeanor must have occurred in the officer's
28 presence to justify a warrantless arrest is not grounded in the Fourth Amendment." The Fourth

10

1  Amendment protects against unreasonable searches and seizures. *Id*. (citing U.S. Const. amend.
2  IV.) "Reasonableness" under the Fourth Amendment, and thus, the constitutionality of a
3  warrantless arrest, requires the existence of probable cause to make an arrest. *Id*. "Thus, the
4  vitality of [the plaintiff's] section 1983 action is not dependent on whether [the officer] was
5  present when [the plaintiff] committed the misdemeanor. Rather, the crucial inquiry is whether
6  [the officer] had probable cause to make the arrest." *Id*. at 772. Based on the evidence in the
7  record, and in light of Plaintiff's failure to dispute this point, the Court concludes that there was
8  probable cause to arrest Plaintiff under California Penal Code § 836(d).

9  Therefore, the Court concludes that viewing the evidence in the light most favorable to
10 Plaintiff, she has not shown that she was arrested without probable cause in violation of the
11 Fourth Amendment. The Court's inquiry concerning qualified immunity thus ends here. *See*
12 *Saucier*, 533 U.S. at 201. Even though there is no need for the Court to continue with the
13 qualified immunity analysis, the Court further concludes that even if Plaintiff did not actually
14 violate Sections 836(d) or 273.5, Peecook and Potter are entitled to qualified immunity because
15 a reasonable officer would have believed there was probable cause to arrest Plaintiff for either
16 offense.

17 **2.    Plaintiff's Section 1983 Claim Against the City Fails as a Matter of Law.**

18 Plaintiff contends that the City is liable under Section 1983 pursuant to *Monell v.*
19 *Department of Social Services*, 436 U.S. 658 (1978), because it ratified the underlying alleged
20 constitutional violations.[4] Municipalities are only liable for injuries that arise from an official
21 policy or custom. *Id*. at 694.

---

[4] Plaintiff alleges that the City "as a matter of policy, practice and custom, have with deliberate indifference failed to adequately train, instruct, monitor, supervise or otherwise direct its officers and employees, including the individual Defendants herein, concerning the rights of citizens, with deliberate indifference to citizens' and to Plaintiff's constitutional rights. (Complaint, ¶ 47.) Plaintiff further alleges under her Section 1983 claim against the City that the City failed to use adequate hiring procedures, and that Potter's and Peecook's unconstitutional acts were "ordered, approved, tolerated, directed, and/or ratified by policy making officers for the City...." (*Id*., ¶¶ 48-49.) However, Plaintiff's opposition brief only opposes the Defendants' motion for summary judgment on the Section 1983 claim against the City based on the City's alleged ratification of Peecook's conduct by failing to discipline her. (Plaintiff's Opp. at 20-21.)

11

As a threshold matter, Plaintiff's Section 1983 claim against the City must be limited to ratification, if any, of the alleged excessive force claim. A municipality may not be held liable under Section 1983 where no injury or constitutional violation has occurred. *Jackson v. City of Bremerton*, 268 F.3d 646, 653 (9th Cir. 2001). The Court has already concluded that Plaintiff cannot establish a constitutional violation based on her alleged arrest without probable cause, and thus, Plaintiff's *Monell* claim cannot be premised on this alleged underlying violation. However, Plaintiff also alleges a Section 1983 claim for excessive force and Defendants did not move for summary judgment on this claim. Accordingly, the Court will analyze whether Plaintiff's *Monell* claim against the City premised on the alleged ratification of excessive force survives Defendants' motion.

Ratification may form the basis for holding a municipality liable under *Monell* "[i]f the authorized policymakers approve a subordinate's decision and the basis for it...." *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003) (quoting *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988)). However, a plaintiff must still "prove [] the existence of an unconstitutional policy." *Id*. (quoting *Praprotnik*, 485 U.S. at 128). While a single decision *may* be sufficient to trigger Section 1983 liability, "the plaintiff must show that the triggering decision was the product of a 'conscious, affirmative choice' to ratify the conduct in question." *Id*. (citing *Gillette v. Delmore*, 979 F.2d 1342, 1347 (9th Cir. 1993)). While a single, post-event ratification may provide the basis to hold a city liable under *Monell*, generally, the Ninth Circuit has done so only when there were very clear instances of abuse and gross recklessness. *See Siwiec v. Thompson L*, 2004 WL 2480516, *22 (D. Or. Nov. 3, 2004) (summarizing Ninth Circuit law on this point); *see also Estate of Escobedo v. City of Redwood City*, 2005 WL 226158, *11 (N.D. Cal. Jan. 28, 2005) ("the Ninth Circuit ... appears to require more than a failure to reprimand to establish a municipal policy or ratification of unconstitutional conduct."); *Kane v. Hodson*, 294 F. Supp. 2d 1179, 1189 (D. Haw. 2003) (same).

The Ninth Circuit's analysis in *Larez v. City of Los Angeles*, 946 F.2d 630 (9th Cir. 1991), and *Haugen* illustrate the considerations courts must take into account to find a municipal liable for a failure to reprimand after an investigation. In *Larez*, an expert testified as

12

1  to the multiple deficiencies and improprieties regarding the police department's procedures and
2  investigation. For example, the unit being investigated, as opposed to a separate internal affairs
3  unit, was given responsibility for passing upon the citizen's complaint. *Larez*, 946 F.2d at 647.
4  In addition, the expert concluded that the investigation contained holes and inconsistencies "that
5  should have been visible to any reasonable police administrator," including improperly relying
6  on testimony from a sergeant who was not even present during some of the relevant incidents to
7  corroborate the defendant officers' claims. *Id*. Moreover, the expert testified that based on his
8  review of the incidents, he would have disciplined the officers involved and taken steps to
9  prevent such violations in the future. *Id*. at 636. The conclusion that the department had a
10 policy of not reprimanding officers for use of excessive force was further corroborated by a two-
11 year study conducted by the expert which demonstrated that it was "almost impossible for a
12 police officer to suffer discipline as a result of a complaint lodged by a citizen" and that it was
13 as if "something had to be done on film for the department to buy the citizen's story." *Id*. at
14 647. In addition, a defendant officer told the plaintiff "I could blow your fucking head off right
15 here and nobody can prove you did not try to do something," while he was pointing a gun in the
16 plaintiff's face. In this context, the court held the city was liable under Section 1983 for failing
17 to discipline the defendant officers. *Id*. at 647-48.

18 On the other side of the spectrum, the Ninth Circuit granted summary judgment against
19 the plaintiff in *Haugen*, because there were no facts indicating that the single failure to
20 discipline the officer rose to the level of a "ratification." *Haugen*, 339 F.3d at 875 (citing with
21 approval *Santiago v. Fenton*, 891 F.2d 373, 382 (1st Cir. 1989) (holding that a failure to
22 discipline in two instances did not demonstrate a sufficiently widespread municipal policy to
23 hold the city liable under *Monell*)). Thus, the court held that the plaintiff failed to demonstrate
24 the decision not discipline the officer was a conscious, affirmative choice to ratify the alleged
25 use of excessive force. *Id*.

26 Here, Plaintiff criticizes the investigation into Peecook's alleged use of excessive force
27 as "patently flawed," because the investigating officer tried to advocate for the department and
28 to talk Plaintiff out of her complaint. (Plaintiff's Opp. at 20-21.) In support of this claim,

13

1  Plaintiff relies on the expert testimony of Van Blaircom, who focuses on two pages of the
2  investigation report in which Sergeant Gallegos describes what he said to Plaintiff after she told
3  him what happened.  (Plaintiff's Ex. F (Blaircom Depo. at 102:14-16, 104:11-107:17).)
4  Notably, Plaintiff does not submit evidence that Sergeant Gallegos failed to interview percipient
5  witnesses or that there were other gaping holes in the investigation.  Nor does Plaintiff contend
6  that Sergeant Gallegos mischaracterized Plaintiff's or any other witnesses' statements.  Plaintiff
7  does not submit any evidence demonstrating there were inconsistencies in the report, or that
8  there were any other instances of improper investigations by the City in which officers were
9  exonerated of complaints of excessive force.[5]

10  In fact, Sergeant Gallegos interviewed eleven people other than Plaintiff, and none of
11  them corroborated Plaintiff's claim of excessive force.  Everyone who witnessed any portion of
12  the events reported that Peecook was patient with Plaintiff, even though Plaintiff was
13  argumentative and belligerent.  Moreover, no one, including Plaintiff's own doctor, was able to
14  corroborate that Plaintiff was injured by Peecock's conduct.  (Defendants' Ex. F.)

15  Moreover, in contrast to the expert in *Larez*, who concluded that based on what he
16  reviewed he would have disciplined all the officers involved and taken preventative steps for the
17  future, Plaintiff's expert concluded that report would have supported a finding of not sustaining
18  Plaintiff's complaint.  His critique was that the report went too far by "exonerat[ing]" Peecook
19  and finding Plaintiff's complaint "unfounded."  (Plaintiff's Ex. F (Blaircom Depo. at pp. 94:12-
20  17).)  Thus, Plaintiff's expert's testimony is far from sufficient to support a finding that the city
21  made a "conscious, affirmative choice" to ratify the alleged unconstitutional conduct in
22  question.  *See Haugen*, 339 F.3d at 875.  Accordingly, the Court concludes that the City's
23  failure to reprimand Peecook does not amount to a policy of under *Monell*, and thus grants
24  Defendants' motion for summary judgment on this claim.

---

[5] Plaintiff also points to a prior investigation and exoneration of an earlier complaint against Peecook.  However, the prior complaint was about Peecook's decision to interview a witness without an advocate present, and is completely unrelated to any claim of excessive force. (Further Declaration of David M. Helbraun, Ex. A.)  Moreover, Plaintiff does not present any evidence or argument that the prior investigation was inadequate or improper. Thus, the prior "complaint" does not support Plaintiff's claim that the city ratified Peecook's use of excessive force.

14

### 3. Plaintiff's Has Not Presented Any Required Evidence of Intent to Discriminate in Support of Her ADA Claim.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.  To recover damages pursuant to Title II of the ADA or the Rehabilitation Act, a plaintiff must prove intentional discrimination by the defendant.  *Duvall v. County of Kitsap*, 260 F.3d 1124, 1138 (9th Cir. 2001).  A plaintiff can show intentional discrimination if defendants acted with deliberate indifference to a plaintiff's disability.  *Id*. at 1138-39.  Proof of deliberate indifference "requires both knowledge that a harm to a federally protected right is substantially likely, and a failure to act upon the likelihood." *Id*. at 1139.  The failure to act requires more than mere negligence; there must be an element of deliberateness. *Id*.

At the hearing, Plaintiff clarified that she does not dispute that she must demonstrate intentional discrimination, but argued that the evidence is sufficient to demonstrate this necessary element.  Here the evidence is undisputed that Peecook and Potter observed plaintiff walking quickly with her crutches across her yard to her grandmother's house and back. (Defendants' Ex. A (Plaintiff's Depo. at 57:10-62:8); Potter Decl., ¶ 5; Peecook Decl., ¶ 11). There is no evidence in the record to suggest that Peecook and Potter knew that physically supporting Plaintiff by holding her arms, rather than having Plaintiff support herself with her crutches, would cause harm to a federally protected right.  Plaintiff has not pointed to any evidence in the record to demonstrate the requisite "deliberateness."  The Court thus grants Defendant's motion on Plaintiff's ADA claim.

### 4. Plaintiff Failed to Submit the Requisite Claim for To Maintain Her State Law Claims.

The California Tort Claims Act, California Government Code §§ 900 *et seq*., requires a plaintiff to present a written claim to a public entity before he or she may bring a suit for money or damages against such agency. *Alliance Financial v. City and County of San Francisco,* 64 Cal. App. 4th 635, 641 (1998) (citing Cal. Gov. Code §§ 905, 945.4).  "[T]he purpose of the

15

claims statutes 'is to provide the public entity sufficient information to enable it to adequately investigate claims and to settle them, if appropriate, without the expense of litigation.'" *Phillips v. Desert Hospital District,* 49 Cal. 3d 699, 705 (1989). "Compliance with the claims statutes is mandatory . . . and failure to file a claim is fatal to [a] cause of action." *City of San Jose v. Superior Court*, 12 Cal. 3d 447, 454 (1974) (internal citation omitted).

Defendants move for summary judgment on Plaintiff's state law claims, arguing that Plaintiff failed to present her claim to the City before filing this action. Plaintiff counters that her telephone conversations with Pat Thompson, the City Manager, substantially complied with the notice requirement to constitute a claim. Alternatively, Plaintiff argues that her telephone conversations conveyed sufficient information to trigger the notice-waiver provisions of California Government Code §§ 910.8, 911 and 911.3. Thus, according to Plaintiff, the City waived its ability to assert Plaintiff's failure to present a claim as a defense because it did not notify Plaintiff and provide her an opportunity to remedy the deficiencies of her claim.

California only requires substantial, rather than strict compliance, with the requirements of presenting a claim. *City of San Jose*, 12 Cal. 3d at 456-57; *Alliance Financial,* 64 Cal. App. 4th at 641. To meet the test for substantial compliance, there must be *some* compliance with *all* of the statutory requirements. *City of San Jose*, 12 Cal. 3d at 456-57 (emphasis in original); *see also Del Real*, 95 Cal. App. 4th at 769 (finding letter that did not provide claimant's address, did not describe injury or loss allegedly suffered, and did not state any amount claimed was not insubstantial compliance). Plaintiff's telephone calls do not meet the test for substantial compliance. First, the statute requires the claim be delivered or mailed to the clerk, secretary or auditor of the public entity, and that it be signed by the claimant or someone on his or her behalf. Cal. Gov. Code §§ 915, 910.2. As a communication that was not even in writing, Plaintiff's telephone calls do not meet either of these two requirements. Second, there is no indication that Plaintiff ever notified the City of the amount she claimed for compensation of her alleged injuries. *See* Plaintiff's Ex. M (Thompson Depo. at 51-72); *see also Phillips*, 49 Cal. 3d at 708 n.7 (holding that notice which did not state the amount plaintiffs sought in damages failed to comply substantially with statutory requirements of Cal. Gov. Code § 910).

16

Nevertheless, if a plaintiff files a claim with the public entity which fails to substantially comply with the Tort Claims Act, the public entity may still have a duty to notify the potential claimant of the claim's deficiencies. If the public entity fails to send such notification when it was required, "the entity waives any defenses as to the sufficiency of the claim based upon a defect or omission." *Green v. State Center Community College*, 34 Cal. App. 4th 1348, 1354 (1995) (emphasis omitted) (citing Cal. Gov. Code §§ 910.8, 911, and 911.3). The California Supreme Court addressed these notice-waiver provisions in *Phillips*. A document constitutes a "claim as presented," giving rise to a duty to notify the potential claimant of any deficiencies if it discloses the existence of a claim which will result in a lawsuit against the public entity if it is not resolved. *Phillips*, 79 Cal. 3d at 707-09. "The content of the correspondence to the recipient must be at least of such nature as to make it readily discernible by the entity that the intended purpose thereof is to convey the assertion of a compensable claim against the entity which, if not otherwise satisfied, will result in litigation." *Green*, 34 Cal. App. 4th at 1358.

In *Shaefer Dixon Associates v. Santa Ana Watershed Project Authority*, 48 Cal. App. 4th 524 (1996), the court analyzed whether a letter sent by the plaintiff and two letters sent by his attorney constituted a "claim as presented." The letter from the plaintiff outlined the history of his work for the public entity and its dispute regarding his fees, and asked the entity's general manager to get personally involved in resolving the fee dispute. *Id*. at 528. The letters from its attorney recited the amount of fees the plaintiff contended was still outstanding and unpaid and that the plaintiff was prepared to "pursue its remedies against the entity" and to "initiate appropriate action for the collection of the outstanding amount." *Id*. at 529. The court concluded that plaintiff's letter was insufficient because it merely provided information and requested negotiation of an ongoing dispute, and did not advise of imminent litigation over a "claim." *Id*. at 534. While the letters from the attorney did advise the public entity of a demand for monetary damages and threaten litigation if not resolved, there were insufficient to provide notice because the time frame for responding provided for by the attorney did not adhere to the procedures in the Tort Claims Act, and were never intended or treated as a claim. *Id*. at 535-37.

17

In *Green*, the plaintiff's attorney sent a letter to the public entity stating that he had been retained as an attorney for the plaintiff with respect to her injuries sustained from an accident. *Green*, 34 Cal. App. 4th at 1352. The court rejected plaintiff's contention that this letter constituted notice of a claim because it did not infer that a claim was being made on plaintiff's behalf or that litigation would follow if the matter was not resolved. *Id.* at 1356.

In *Loehr v. Ventura County Community College*, 147 Cal. App. 3d 1071, 1077 (1983), the plaintiff sent a letter requesting that the board of trustees reconsider its action discharging him from office and seeking to be reinstated to his former position. At most, the letter stated a demand that the board reinstate him or face possible legal action. The Court found this letter insufficient to give the board notice because the letter did not state the plaintiff had a claim for money damages, or even estimate the amount of any prospective injury, damage, or loss. *Id.* at 1083.

Plaintiff's telephone calls to the City Manager do not amount to a "claim as presented" triggering a duty to notify Plaintiff of any deficiencies for several reasons. First, her calls were oral, rather than written communications. Plaintiff has not cited, and the Court has not found, any cases in which oral communications triggered the notice and waiver provisions. Notably, the cases in which the plaintiff had both oral and written communications with the public agency, the courts did not even consider whether the oral communications could provide sufficient notice to invoke the notice-waiver provisions. *Shaefer Dixon Associates*, 48 Cal. App. 4th at 527; *Alliance Financial*, 64 Cal. App. 4th at 639. Second, similar to the communications in *Schaefer Dixon Associates, Green*, and *Loehr*, the substance of Plaintiff's communications did not convey that she was making a claim for compensation for injuries, or that failure to satisfy her claim could result in litigation. The only evidence Plaintiff submits of her conversations with the City Manager is the transcript from the City Manager's deposition. The City Manager testified that Plaintiff told her that "her back was hurting her and that she needed to have rehab and wanted to know if the city would be willing to pay for that; that she needed rehab." (Plaintiff's Ex. M (Thompson Depo. at 56:5-8).) Ms. Thompson took notes of the conversation with Plaintiff, indicating that Plaintiff wanted physical therapy for her lower

18

back. (*Id.* (Thompson Depo. at 59:18-20, 60:11-20).) There is no indication that Plaintiff informed the City Manager how much she was requested for physical therapy, let alone whether and how much she was seeking in compensation for her injuries.

Moreover, Plaintiff has not submitted any evidence demonstrating that she informed the City that she would pursue litigation if her claims were not resolved. Plaintiff told the City Manager that she "was going to be taking it further." The City Manager testified that she interpreted this ambiguous statement to mean Plaintiff was going to sue the City for "improperly handling her case." (Plaintiff's Ex. M (Thompson Depo. at 29:10-16).) Plaintiff's comment seems to address the City's investigation of Plaintiff's complaint, and not the initial incident involving Plaintiff's arrest, which is the basis for Plaintiff's state law claims. Moreover, that Plaintiff intended to be "taking it further" is too vague to put the City on notice that Plaintiff would initiate litigation if her claim was not resolved.

Accordingly, the Court concludes that Plaintiff failed to demonstrate that she provided sufficient notice to the City to trigger the notice-waiver provisions. Because the City has not waived its ability to assert Plaintiff's failure to file a claim as defense, the Court grants Defendants' motion for summary judgment against Plaintiff's state law claims.

### 5. Plaintiff's Excessive Force Claim Against Potter Survives Summary Judgment.

Defendants did not move for summary judgment on Plaintiff's Section 1983 claim against Peecook premised her on alleged use of excessive force, but did move for summary judgment on this claim as to Potter. Defendants argue that, at most, Potter observed, but did not participate, in the alleged excessive force, and thus, cannot be held personally liable. Plaintiff argues that Potter participated by handing handcuffs to Peecook and by assisting Peecook in carrying out Plaintiff. At the hearing, Plaintiff cited *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1996), *rev'd in part and aff'd in part on other grounds*, 518 U.S. 81 (1996), for the proposition that an officer may be liable to failing to intercede in another officer's violation of a person's constitutional rights. The Ninth Circuit explained in *Koon*, that:

> [p]ursuant to a long line of civil cases, police officers have a duty to intercede when their fellow officers violate the constitutional rights of a suspect or other citizen. ... In these

19

> cases, the constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows. Thus an officer who failed to intercede when his colleagues were depriving a victim of his Fourth Amendment right to be free from unreasonable force in the course of an arrest would, like his colleagues, be responsible for subjecting the victim to a deprivation of his Fourth Amendment rights.

*Id*. It is undisputed that Potter was present when Peecook allegedly used excessive force. If Peecook used excessive force, then Potter may be liable under Section 1983 for failing to intercede. Accordingly, the Court denies Defendants' motion on this ground.

## CONCLUSION

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Defendants' motion for partial summary judgment. Defendants' motion is GRANTED as to Plaintiff's Section 1983 claim to the extent it is premised on the arrest without probable cause, Plaintiff's Section 1983 claims against the City, Plaintiff's ADA claim, and Plaintiff's state law claims. Defendant's motion is DENIED as to Plaintiff's Section 1983 claim against Potter to the extent it is premised on excessive force. Thus, Plaintiff's only remaining claim is her Section 1983 claim against Potter and Peecook to the extent it is premised on excessive force.

**IT IS SO ORDERED.**

Dated: July 14, 2005

/s/ Jeffrey S. White
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE