
DAVID M. HELBRAUN (SBN 129840)
**HELBRAUN LAW FIRM**
180 Sutter Street, Suite 200
San Francisco, California 94104
Telephone: (415) 982-4000
Facsimile: (415) 352-0988

DAVID HICKS, APLC (SBN 053750) (Fee Counsel)
2200 Powell street, Suite 990
Emeryville, CA 94608
Telephone: (510) 595-2000
Facsimile: (510) 594-9555

Attorneys for Plaintiff
STEPHANIE HARRINGTON

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEPHANIE HARRINGTON,<br><br>　　　　Plaintiff,<br>v.<br><br>CITY OF NAPA, a municipal entity, POLICE OFFICER DEBBIE PEECOOK, POLICE OFFICER BRETT POTTER, in their individual and official capacities, and DOES 1-100, Jointly and Severally,<br><br>　　　　Defendants. | Case No. C04-00958 JSW<br><br>**DECLARATION OF DAVID M. HELBRAUN IN SUPPORT OF PLAINTIFF'S MOTION FOR ATTORNEY'S FEES AND COSTS**<br><br>Date: October 14, 2005<br>Time: 9:00 a.m.<br>Court: 2, 17th Floor<br><br>Honorable Jeffrey S. White |

I, David M. Helbraun, do declare:

1. I am an attorney licensed to practice before all the Courts of the State of California and before the United States District Courts for the Northern District of California, Eastern District of California, and Central District of California. I am lead attorney and trial counsel for Plaintiff Stephanie Harrington in this matter.

2. I am a 1982 Yale College graduate (attending on scholarship and financial aid), and I am a 1987 alumnus of University of California Hastings College of the Law. In November 2005 I will be entering my nineteenth year of practice as an attorney. I have practiced in both State and Federal courts that entire time.

3. I started my own firm in September 2002, having been a partner in the San Francisco office of Wilson Elser Moskowitz Edelman & Dicker from 1997-2000, and Of Counsel to Kelly Herlihy & Klein from 2000-2002. I am a sole practitioner with a full and challenging general civil litigation practice, focused primarily in the areas of business, construction, copyright and trademark, professional liability, and civil rights. I handle every aspect of my cases, from retention through litigation, negotiations, mediations, and trial or arbitration. I am also responsible for all law firm business matters, including generation of new cases and work.

4. I have received an "AV rating" from Martindale-Hubbell, based on a survey of judges and attorneys in the community. Martindale-Hubbell defines this rating as follows: "An AV rating reflects an attorney who has reached the heights of professional excellence. He or she has usually practiced law for many years, and is recognized for the highest levels of skill and integrity."

5. I began working on civil rights cases as an associate for Richard J. Idell, who had been Carlos Bea's associate before he was first appointed to the bench. I worked for Richard J. Idell from 1987 through 1990 in a range of general civil litigation matters, including a racial discrimination/excessive force case against a traffic officer at the San Francisco International Airport. During that period, I successfully tried a copyright case with Mr. Idell before Judge Eugene Lynch of the U.S.D.C. for the Northern District of California.

6. From early 1991 through 1996, I was an associate at Wilson Elser Moskowitz Edelman & Dicker, specializing in professional liability, and insurance coverage litigation. I also maintained a small copyright and trademark practice. Among the significant matters I have handled over the years are the trial of a bad faith insurance case in the San Francisco Superior Court, the successful defense of Papyrus, Inc. in a franchise litigation matter before the American Arbitration Association, obtaining a multi-million dollar recovery on behalf of the Tennessee Insurance Commissioner, and representing design professionals in litigation arising out of construction of the San Francisco Airport's International Terminal. In 2001, I was specially retained as trial counsel to try a brain injury case in Hayward Superior Court. I have also served as a lecturer on legal ethics and avoiding legal malpractice, and have been a member of the State

Bar Committee on Professional Liability Insurance for several years.

7. Since 2000, I have successfully prosecuted four police excessive force cases, including this one. In late 2002, the California Highway Patrol paid $130,00 to settle the case of *Bauman v. Morgan*, U.S.D.C. Northern District Action No. C-01-1280-WHA. In 2004, the City of Oakland paid $52,500 to settle the case of *Pruitt v. City of Oakland*. In 2005, the City and County of San Francisco paid $12,500 in an early settlement of a case involving a minor thumb fracture received during the March 2003 Iraq War demonstrations. It is my general approach to pursue early settlements whenever possible in civil rights cases in particular, to encourage efficiency in the litigation process and an early recovery for my client, as well as to prevent the defendants' exposure to statutory attorneys fees and costs from becoming a substantial factor in the litigation.

8. In this case, defendants refused to discuss settlement at all times. When the parties were required to choose a form of ADR in late 2004, counsel for the City of Napa and the officer defendants stated he would only agree to Early Neutral Evaluation, because he "did not want to give any indication that they would ever pay anything on this case." At the Early Neutral Evaluation in January 2005, the Evaluator concluded that if plaintiff defeated summary judgment, she had a 40% chance of winning at trial, with a "potentially dangerous" upside to plaintiff, and he estimated the settlement value of the case at that time as "$25,000 to $50,000." Plaintiff asked the ENE Evaluator to attempt to conduct a settlement negotiation, but he advised that the City and officer defendants were unwilling to discuss settlement. Shortly after the ENE Conference, plaintiff reached a settlement with the County of Napa.

9. On more than one occasion, I advised defense counsel that the more depositions he noticed (defendants noticed *thirteen* (13) non-party percipient witness depositions alone in this case), the more expensive the litigation became and the more difficult it would therefore be to settle this case. No settlement offers were ever made.

10. After the hearing on Defendants' Motion for Partial Summary Judgment, the Court ordered this case to a Settlement Conference before Magistrate Judge Elizabeth Laporte. At the Settlement Conference on June 23, plaintiff came prepared to resolve the case, if possible. Defendants made no offers. After speaking with plaintiff and her counsel, Judge Laporte advised

she had ordered defense counsel to again approach the Napa City Council for settlement authority. During a break from an expert deposition in this case a week or two later, I informed defense counsel of plaintiff's willingness to substantially compromise her demand. No settlement offer was ever made in response to this overture, nor in response to Judge Laporte's request that the defendants go back to the City Council for authority. No FRCP Rule 68 Offer was ever made in this case, either.

11. A total of *twenty-four* (24) depositions were taken in this case. Of those, five (5) were expert depositions, and three (3) were of the parties. Of the remaining sixteen depositions, *thirteen* (13) were noticed by the defense, and three (3) were noticed by plaintiff. Defendants deposed plaintiff's mother, daughter, grandmother, ex-husband, and close friend; as well as *eight* of her doctors and physical therapists for several years prior. All sixteen percipient witness depositions required that I spend a significant portion of my day traveling to and from Napa from my office in San Francisco. While it was reasonably anticipated in agreeing to take on this case for plaintiff that I would need to go to Napa for some depositions, the extraordinary number of percipient witness depositions noticed by defendants required that I devote substantial, unanticipated, additional time to prepare for and attend each and every deposition in Napa.

12. In an effort to minimize costs and fees, plaintiff took only the depositions of defendants Officers Peecook and Potter; the two City of Napa Police Department Internal Affairs Officers who investigated plaintiff's complaint, Sgts. Lavoy and Gallegos; and the City Manager, Patricia Thompson, who spoke with plaintiff on the telephone about her claims. I considered, but did not take, the depositions of the following booking and medical personnel at the Napa Jail: Rene Solis, Ken Adkins, Darlene Abasta, Dr. John Hibbard, and an unidentified second Jail nurse.

13. At the time of trial, every witness who had been deposed was listed by the parties on one or both sides as a witness to be called at trial. Defendants also listed additional witnesses from the County of Napa Jail.

14. Defendants took plaintiff's video-taped deposition over the course of three separate days, totaling about 16 hours. Shortly before jury selection commenced, the defendants provided plaintiff with a DVD disco of forty (40) separate excerpts from plaintiff's three days of

1  depositions, which counsel was obliged to review, and where appropriate, to specify additional
2  excerpts to properly complete the cited testimony.  Defendants ultimately used only *one* (1) of
3  those 40 excerpts at trial.

4        15.  Defendants also unreasonably challenged the supplemental report of Dr. Eric Denys as
5  soon as it was provided on or about May 9, 2005, which was after the expert report cut-off date.
6  The parties met and conferred, and I explained to counsel that under the FRCP and applicable case
7  law there was no prejudice to defendants and that the report was late not due to any bad faith
8  conduct but for substantial justification due to Dr. Denys' busy practice and inadvertent delay.
9  Defense counsel insisted on preparing a letter motion to the Court, and plaintiff was of course
10 obliged to participate and to draft her rendition of the facts and applicable law.  Defendants then
11 never brought that prepared motion to the Court's attention.  Rather, defendants waited until the
12 eve of trial and brought the motion as a pre-trial in limine motion, requiring plaintiff to re-brief
13 the issue.  The Court denied that in limine motion.

14       16.  During preparation of the Joint Final Pretrial Conference materials required by the
15 Court, plaintiff's counsel took the lead in meeting and conferring and in drafting and delivering
16 the final versions of all materials to the Court.  The Court complimented the parties on the quality
17 of the submissions at the Joint Final Pretrial Conference.

18       17.  Plaintiff Stephanie Harrington was referred to me by the law firm of Haddad &
19 Sherwin, in Oakland, California, a well-recognized firm specializing in civil rights and police
20 cases.  I am advised that Haddad & Sherwin were unwilling to take on plaintiff's case because of
21 the absence of a neutral third-party witness, as well as because plaintiffs' actions the night of her
22 arrest, such as going to her grandmother's house and locking her bedroom door, appeared
23 intended to obstruct or delay the officers.  Despite these substantial factual obstacles, and despite
24 the expensive and time-consuming litigation strategy engaged in by the defense, plaintiff
25 nevertheless prevailed, and obtained a unanimous jury verdict in her favor at trial.

26       18.  The defendants prepared and tried the case solely on the theory that their version of
27 events was truthful, and that plaintiff's account was not.   The jury's special verdict made clear
28 they rejected the defense version of events, and found instead that unreasonable, excessive, force

had been used on plaintiff by Officer Peecook, which should have been, but was not, stopped by Officer Potter.

19. The City of Napa refused to provide any compensation to plaintiff when she requested very limited compensation in the summer and fall of 2003, following her arrest at the end of May 2003. After the Napa Police Department exonerated their officers, plaintiff telephoned the Napa City Manager, Patricia Thompson, with her concerns. Plaintiff explained she felt the officers had acted improperly, particularly in light of her obvious disability, and plaintiff requested assistance to pay for physical therapy for her back problems resulting from the arrest. Plaintiff knew that her own health insurance would not pay for physical therapy, because she had just completed a course of P.T. treatment for her shoulder and neck shortly before the arrest.

20. In November 2003, plaintiff learned from a specialist, Dr. Marko Bodor, that the severe head pain she had been experiencing on and off since the arrest was likely caused by defendant Peecook's jerking on her shoulder. Subsequently, plaintiff found that only morphine sulfate helped diminish her pain, and doctors at UC Davis Medical School advised her she would need surgery. (The UC Davis doctors subsequently decided surgery would not help.) Only as a result of these developments, in late 2003 and early 2004, did plaintiff decide to seek legal representation. It was always necessary in the conscientious and zealous representation of plaintiff to present her claims for occipital neuralgia, with resulting medical and lost earnings damages, despite the fact that medical documentation of the condition was scant until five months after the arrest because plaintiff's prior history had tended to mask the new symptoms, and because of plaintiff's own innate stoicism and naive belief that she could self-manage those symptoms to resolution.

21. Handling this case through discovery, motion for partial summary judgment, expert depositions, an unsuccessful settlement conference, and trial during most of the month of August, put significant stress on my practice and representation of other clients. The contingent risk involved in handling this case required that I make sure time spent working on this case was absolutely necessary, since time spent on this case is time I can not spend on other cases, or on new client generation.

22. My contemporaneously kept time records for work on this case are attached hereto as Exhibit "A." I entered these time records on my "Timeslips" software on a daily basis. "Timeslips" is a commonly used and widely accepted attorney time-keeping software. My general practice is to enter the particular task undertaken in the matter, and the time it took to accomplish the task, in increments of six minutes (1/10 hour). The time entries are maintained in the Timeslips data base on my computer, and are also backed-up regularly to a separate CD-ROM disc. I have simply generated a "bill" for this matter by initiating that function for this case. The computer program then automatically lists each and every entry with the date the task was performed, the amount of time it took to perform it, and the corresponding amount charged for that entry at the assigned billing rate.

23. In October 2004, I had a computer "crash" and was unable to recover Timeslips time entries for a period of time from the middle of July 2004 to the middle of October 2004, about three months. I am certain there was time spent on this case during that period, for which I do not have documentation, as a result of the computer "crash" and the failure of my back-up system at that time. For instance, my file materials show substantial work on a Stipulated Protective Order submitted by defense counsel, which counsel then withdrew in favor of the court's form Protective Order, as well as work reporting to the client the result of the Initial Case Management Conference, and working on plaintiff's medical issues. Nevertheless, *as that three months of time is no longer recorded, I am not claiming any of it.* I also note that there are several blank pages within the attached Exhibit "A," starting from the bottom of page 11 and running to the middle of page 18. I believe these blank pages are somehow the result of the computer crash or my computer consultant's fix. Rather than remove the blank pages, I have left them exactly as the computer program has generated the "bill." In any event, the blank sheets do not represent any time for which I am claiming fees. I am only claiming fees for those entries recorded.

24. I have reviewed the attached time records for my work on this case, and I am seeking attorneys fees only for that work that I believe was reasonably necessary to represent plaintiff and to achieve a trial verdict in her favor, in this case. My time records show that I have worked 721 hours on this case. I have also exercised billing judgment, as I do for work on all my clients'

cases. I have not charged for my work on this case that I feel was not reasonably necessary, such as certain research and preparation of the Complaint based upon a previous ADA claim against city police in Kansas City, and the need to amend the Complaint to name the County of Napa because the Napa Jail is administered by the County and not by the City of Napa. Time for which I am not billing amounts to 4.1 hours, and I have indicated "No Charge" on the attached time sheets/"bill" with regard to those time entries. The net time worked on this case to date, exclusive of those 4.1 hours, and exclusive, of course of the three months of lost time entries as a result of the computer crash, is 716.90. I am claiming a total of 681.05 hours. Of those hours, 41.10 have been incurred post-verdict.

25. After consultation with David Hicks, Richard Pearl, and Michael Haddad, as well as with other attorneys knowledgeable regarding Bay Area market rates, I am seeking attorneys fees for my work on this case at a rate of $400.00 per hour, which I believe is within the range of prevailing market rates charged by partner-attorneys of my skill, experience, and expertise for comparable work.

26. I have also recorded some, but not all, time I spent on "paralegal" type work early in the case before I hired an administrative assistant in 2005. Most of this time for paralegal work type work was not recorded by me, and if not recorded, is not being sought. Where such paralegal time was recorded, it was done according to my firm's usual contemporaneous Timeslips-based recordation methods, as set forth above in this Declaration. Based on consultation with David Hicks, Richard Pearl, Michael Haddad, and other attorneys knowledgeable regarding Bay Area market rates for paralegal time, that rate is $100 per hour. I believe this rate to be consistent with the hourly rate charged by other Bay Area firms for experienced litigation paralegals. Any and all paralegal time charged for is included in the attached bill, and is denoted by the insignia "PLGL," and is in the amount of 9.66 hours.

27. Documentation for out-of-pocket expenses incurred by my firm is included within the attached Exhibit "A," separately listed as "Expenses" at the end of the bill. Records for these expenses are kept by my firm in the regular course of business. I have reviewed the documentation of costs claimed by plaintiff in connection with this motion for fees and costs. All

1  of those documented costs, amounting to $49,998.40, were reasonably and necessarily incurred in this case. The majority of these expenses are deposition transcripts ($13,678.97) plus other Cost Bill items totaling $15,752.56, and expert fees totaling $29,392.00 (see par. 29 below). Again, given my firm's limited resources, I was vigilant to litigate this case on the most cost-efficient basis possible, while representing plaintiff conscientiously and zealously to the best of my ability.

    28. This case was particularly risky and stressful for my practice because of the difficulty of the issues presented and the well-funded and skilled defense presented by the City of Napa. Without any guarantee of payment, I spent approximately 700 hours on this case, and without contribution from my disabled client, have invested approximately $50,000 total in costs, including expert fees. Had this civil rights case been lost, it would have been a severe blow not only to plaintiff, but also to me personally.

    29. It was necessary and reasonable to retain various experts to support plaintiff's case. A police practices expert, D.P. Van Blaricom, was retained – his expert fees total $8,620.00. A neurologist expert, Dr. Eric H. Denys, was retained – his expert fees total $16,872.00. A vocational expert, Carol Hyland, was retained to discuss plaintiff's lost earnings claim – her expert fees total $3,900.00. These fees total $29,392.00. Each of these three expert's final accounting of amounts they have billed to my firm in this case are attached hereto within Group Exhibit "B" and are separated as Exhibits B-1, B-2, and B-3 (D.P. Van Blaricom; Carol Hyland; and Dr. Eric Denys, respectively). I am aware that the applicable attorneys fees statute may not authorize recovery of these costs. I have nevertheless attached these items as Group Exhibit "B" to convey to the court the magnitude of the investment my firm made in this case so as to zealously and conscientiously present plaintiff's claims in their entirety.

    30. Pursuant to Civil Local Rule 54-6, I attempted to meet and confer in good faith with defense counsel concerning plaintiff's costs and fees as prevailing party. Since defense counsel is in Napa, California and my office is in San Francisco, we met and conferred via telephone. On September 1, 2005 we discussed these issues over the telephone. Defense counsel stated he did not think plaintiff was the prevailing party for cost purposes, and would not stipulate to any item of claimed costs, including deposition transcript costs of $12,569.40 (not including the trial

testimony transcript of defense expert Dr. Jim Anderson), or costs relating to service of subpoena and summons. As to attorney's fees, I explained that I had about 700 hours into the case to date, and I asked defense counsel to make an offer to settle the attorneys fees issue based on a reasonable market rate for attorneys fees. Defense counsel refused to make any offer. Attached hereto as Exhibit "C" is a true and correct copy of my letter dated September 2, 2005, confirming this telephone conversation. I subsequently requested that defense counsel provide me with copies of the detailed invoices they received from their associate counsel at the law firm of Hanson Bridgett Marcos Vlahos, which counsel declined to readily provide.

31. Attached hereto as Exhibit "D" is a true and correct copy of my Contingent Fee Agreement with Plaintiff Stephanie Harrington.

32. I have personal knowledge of the matters stated in this declaration. The source of my information given herein is derived from personal knowledge, investigation and discussions conducted in the ordinary course of this case. If called upon to testify as to the truth of the matters contained herein, because I have seen, observed, witnessed or heard each of said matters, I would be competent to and would testify to the foregoing.

33. Due to the volume of the Exhibits submitted in support of this motion, and based upon my understanding of General Order 45, Section VII, I have e-filed this Declaration and have caused to be manually filed the separate Plaintiff's Appendix of Exhibits thereto, while e-filing the Plaintiff's Appendix accompanied by the required Manual Filing Notification. The entire Attorney's Fees Motion briefing, including the manually filed Plaintiff's Appendix, has been served on defense counsel by U.S. Mail.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct to my personal knowledge and belief, and that I executed this Declaration on the 7th day of September, 2005, in the City and County of San Francisco, California.

_____/s/_____

David M. Helbraun

---

**DECLARATION OF DAVID M. HELBRAUN IN SUPPORT OF PLAINTIFF'S MOTION FOR FEES AND COSTS**
**Case No.  C-04-00958 JSW**                                                                                                         10